UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X

COHERE COMMUNICATIONS, LLC d/b/a :     Case No. 1:22-cv-6832
COHERE CYBER SECURE     :

               Plaintiff,    :     **COMPLAINT**

               :     **JURY TRIAL DEMANDED**

   -against-    :

               :

COLOHOUSE, LLC, COLOHOUSE NYC, LLC f/k/a :
GHD ORANGEBURG, LLC, and     :
FIFTEENFORTYSEVEN CRITICAL SYSTEMS     :
REALTY, LLC     :

               :

               Defendants.    :
---------------------------------------------------------------- X

Plaintiff Cohere Communications, LLC d/b/a Cohere Cyber Secure ("Plaintiff"), by and through its attorneys, Herrick, Feinstein LLP, as and for its Complaint against Defendants ColoHouse, LLC ("ColoHouse"), ColoHouse NYC, LLC f/k/a GHD Orangeburg, LLC ("GHD"), and FifteenFortySeven Critical Systems Realty ("1547," and together with ColoHouse and GHD, collectively, "Defendants"), alleges as follows:

## NATURE OF ACTION

1.  By this action, Plaintiff seeks to recover the damages it suffered as a result of a nearly six-hour long power outage at a data center owned by Defendants caused by the gross negligence of Defendants in the performance of power maintenance immediately before the start of business hours, without proper notice in advance to Plaintiff, and the failure of Defendants to use any reasonable efforts to remediate what should have otherwise been an easy fix.

2.  Plaintiff also seeks an order of specific performance under the relevant agreement between the parties directing Defendants to give proper notice in advance of maintenance outside the standard scheduled maintenance window, and an order enjoining Defendants from performing such maintenance without such proper notice to Plaintiff.

1

## PARTIES

3.      Plaintiff is, and at all relevant times has been, a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business located at 845 Third Avenue, 19th Floor, New York, NY 10022.

4.      Upon information and belief, at all relevant times, Defendant ColoHouse is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business of 36 NE 2nd St., Ste 400, Miami, FL 33132, where process is authorized to be served.

5.      Upon information and belief, ColoHouse is not authorized to do business in New York.

6.      Upon information and belief, Defendant GHD is a limited liability company organized and existing under the laws of the State of Colorado, and is authorized to do business in New York.

7.      Upon information and belief, GHD's principal place of business is 96 Freneau Avenue, Matawan, NJ 07747 and also has an address for service of process at 304 Progress Circle, Cheyenne, WY 82007.

8.      Upon information and belief, Defendant 1547 is a limited liability company organized and existing under the laws of the State of Delaware, and is authorized to do business in New York.

9.      Upon information and belief, 1547's principal place of business is 96 Freneau Avenue, Matawan, NJ 07747 and also has an address for service of process at C/O Corporation Service Company, 80 State Street, Albany, NY 12207.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Defendants pursuant to 28 U.S.C. § 1332 as this is a dispute between citizens of this State and citizens of a foreign state.  The amount in controversy exceeds $75,000.

11.     The United States District Court for the Southern District of New York has personal jurisdiction over Defendants pursuant to CPLR §§ 302(a)(1) because Defendants transact business within the state of New York and contract to supply services in New York.

12.     The United States District Court for the Southern District of New York has personal jurisdiction over Defendants pursuant to CPLR §§ 302(a)(2) because Defendants committed tortious acts within the State of New York.

13.     The United States District Court for the Southern District of New York has personal jurisdiction over Defendants pursuant to N.Y. Bus. Corp. Law § 1314(b), which allows an action against a non-resident corporation in New York when "a non-domiciliary would be subject to the personal jurisdiction of the courts of this state under section 302 of the civil practice law and rules," or "[w]here the defendant is a foreign corporation doing business or authorized to do business in this state."

14.     The claims at issue arise out of and relate to Defendants' contacts with the State of New York, and they purposefully availed themselves of the privilege of doing business in New York and therefore Defendants could reasonably foresee being haled into the Courts of New York.  Accordingly, the exercise of jurisdiction over Defendants comports with the traditional notions of fair play and substantial justice.

15.     Venue is proper in this district as there is a forum selection clause in the relevant agreement requiring that the "location of any legal proceeding arising out of the Services or this Agreement shall be in the borough of Manhattan, New York."

## FACTUAL BACKGROUND

### A.  Background On Plaintiff

16.     Plaintiff is an accredited provider of cloud and managed cyber security and IT business services, focused on providing financial services organizations – i.e., those businesses with the highest volume and sophistication of cyber threats – a combination of total cyber security, risk assessment, compliance, and remediation services, often serving as the single source for all of its clients' network, IT, and cyber security needs.

17.     Amongst other locations, Plaintiff operates a network operations and data center out of a facility at One Ramland Road in Orangeburg, New York that is owned by Defendants (the "Data Center").

### B.  Background On Defendants

18.     According to its website, 1547 is a developer and operator of custom-designed data centers.

19.     Upon information and belief, GHD is a subsidiary or affiliate of 1547.

20.     1547 owns over 100,000 square feet of space at the Data Center.

21.     Upon information and belief, ColoHouse is a colocation, cloud, and managed services provider with 26 locations in 21 cities across North America, Europe, and Asia.

22.     Colocation services is the practice of renting space for servers and other computing hardware at a third-party provider's data center facility.  Colocation services include the building where everything is housed, the networking, physical security, redundant power, and redundant cooling component, which then supports the servers and storage provided by the customer.

23.     Upon information and belief, in May 2022, ColoHouse purportedly acquired 15,000 square feet of space in the Data Center from 1547 and/or GHD.

24.     In the press release issued by ColoHouse, John Bonczek, the Chief Revenue Officer of ColoHouse, stated that "Our Orangeburg facility is up to the task of meeting [our clients] strict security requirements, space, power, and connectivity needs."

25.     In the same press release, Mr. Bonczek acknowledged that the Data Center had "particular interest from the financial enterprises."

26.     The Master Services Agreement between Plaintiff and GHD ("MSA") states that "[n]either party may assign or transfer its rights and obligations under [the MSA] without the other party's written consent; provided, however, either party may transfer or assign this [MSA] and its rights and obligations hereunder to any of its affiliates, parents, or subsidiaries, or as part of a merger, sale of all or substantially all of its assets, acquisition, or financing upon prior written notice to the other party provided that the assignee agrees in writing to comply with all terms and conditions of this [MSA]."

27.     Upon information and belief, GHD assigned its interest in the MSA to ColoHouse, without providing notice to Plaintiff.

28.     Plaintiff did not consent to an assignment of the MSA.

29.     Upon information and belief, ColoHouse did not agree to comply with all terms and conditions of the MSA.

30.     Until the events at issue described in § D below, Plaintiff had no clue who ColoHouse was.

**C.  The MSA.**

31.     On or about December 2, 2019, Plaintiff and GHD entered into the MSA.

32.     The MSA "governs all orders executed by [Plaintiff] and [GHD] providing for [Plaintiff's] access to and use of any service provided to it by [GHD]."

33.     The MSA incorporates all service orders between Plaintiff and GHD and Addendums for the anticipated services rendered by GHD to Plaintiff.

34.     Per the Addendum, also dated December 2, 2019 (the "Addendum"), GHD agreed to provide colocation services to Plaintiff at the Data Center.

35.     Plaintiff entered into numerous service order agreements with GHD so as to facilitate colocation services for Plaintiff's clients.

36.     The monthly recurring charges paid by Plaintiff pursuant to its service orders is at least $21,901.16.

37.     Per § 9 of the Addendum, GHD agreed to provide colocation services in accordance and compliance with the Service Level Agreement, which is Exhibit A to the Addendum (the "Service Level Agreement").

38.     The Service Level Agreement provides that [GHD] shall have power available for [Plaintiff] "100% of the time." (the "Power Guarantee").  And, in the event GHD fails to meet the Power Guarantee, Plaintiff would be entitled to certain credits as provided by the Addendum – including "25/30th of the total monthly recurring charge for the Space" for outages greater than 60 minutes in any given month, "plus the applicable credit for any partial hour, not to exceed the total monthly recurring charge for the Space."

39.     Not only that, in the event there is a service interruption, the Service Level Agreement obligates GHD to "commence efforts to resolve any Service interruption within thirty (30) minutes after [GHD] learns of it" and to "use best efforts to remedy the Service interruption within one (1) hour of determining the source."

40.     Finally, the Service Level Agreement makes GHD "responsible for repairing and maintaining the electrical system used to supply power to the Data Center and Space and shall provide a generator to back up the power supply."

41.     Per § 5 of the MSA, "[i]n the event of any change in [GHD's] standard scheduled maintenance window, [GHD] will provide at least five (5) business days prior written notice by email to [Plaintiff] of scheduled maintenance affecting the Services…"

42.     Section 20 of the MSA provides for time being of the essence with respect to GHD's performance of its obligations under the MSA.

43.     Finally, § 15 of the MSA provides for prevailing party legal fees and court costs in connection with "any legal proceeding arising out of or related to this [MSA]."

44.     In the MSA, GHD represented and warranted that: "FOR THE DURATION OF THIS AGREEMENT AND WHILE ANY SERVICE IS BEING PROVIDED TO CUSTOMER, [GHD'S] PERFORMANCE OF ITS OBLIGATIONS AND PROVISIONS OF THE SERVICES UNDER THIS AGREEMENT SHALL BE IN A MANNER CONSISTENT WITH INDUSTRY STANDARDS REASONABLY APPLIED TO THE PROVISION OF SUCH SERVICES AND [GHD] WILL USE QUALIFIED INDIVIDUALS WITH SUITABLE TRAINING, EXPERIENCE, AND SKILL TO PERFORM ITS OBLIGATIONS HEREUNDER."

45.     Further, Section 17 of the MSA provides that "…with respect to its provision of any Services under the [MSA], any and all support for any of [Plaintiff's] customers shall be coordinated with and provided directly to [Plaintiff] and [GHD] shall not have any direct contact with any of [Plaintiff's] customers without [Plaintiff's] explicit written consent."

**D.  The Power Outage**

46.     During the relevant period, GHD's "standard scheduled maintenance window" was on weekend nights so as to minimize interruption of services rendered to Plaintiff and other similarly situated clients of Defendants.

47.     On June 17, 2022, William McNutt of ColoHouse sent an email to support@colohouse.com, which apparently is a group email account which includes Plaintiff, purportedly notifying Plaintiff that scheduled electrical maintenance on the power distribution units would take place on Monday, June 27, 2022, which included shutting down B-side power distribution panels.  The email specifically indicates that "[t]his maintenance will not impact A side circuits during this time."  It further indicates that "We do not anticipate any disruption of service during this maintenance window's duration, dual power corded, customer equipment will remain online throughout this procedure."  (the "June 17 Email").

48.     The June 17 Email was not reviewed by Plaintiff because, as of June 17, 2022, Plaintiff had no clue who ColoHouse was in relation to the Data Center since Plaintiff was never informed that ColoHouse had acquired the Data Center.

49.     In fact, Plaintiff did not discover this email until weeks after the Power Outage described below.

50.     Had Plaintiff discovered this email before the scheduled maintenance it would have vehemently objected to any electrical maintenance on a Monday, immediately before the start of business hours.

51.     Scheduled electrical maintenance should never take place during or immediately before business hours due to the risk of a power outage and service disruption.

52.     On Monday, June 27, 2022, at approximately 8:00 A.M. – immediately prior to the start of normal business hours on the east coast – *and without any notice in advance from GHD*, ColoHouse performed power maintenance at the Data Center.

53.     It is beyond reckless for any colocation service provider to perform any maintenance, let alone power maintenance, during or immediately before business hours given the risk of service interruption.

54.     Upon information and belief, Defendants performed the power maintenance on a Monday morning so as to avoid paying overtime to employees.

55.     The power maintenance on June 27, 2022 caused a power outage at the Data Center (the "Power Outage").

56.     According to 1547's Rules and Regulations, a power outage at the Data Center can cause "loss of data, lost revenue, financial liability, and a decline in customer service."

57.     The maintenance performed by Defendants included cutting off the 'B' feeder to all server cabinets, which surged to the 'A' side (despite the fact that the June 17 Email said the maintenance would have no impact on the 'A' side), causing the breakers to trip on numerous server cabinets.

58.     When performing this sort of power maintenance, it is standard industry practice to transfer the electrical load to a backup motor/generator and to have multiple qualified staff on site to communicate with tenants and take appropriate remedial action.

59.     Indeed, a technician with any sort of IT background would have known to roll back its maintenance efforts and restore the B-feeder.

60.     Besides the fact that notice was required under the MSA, it is common sense and industry practice to give notice to all tenants of the Data Center of power maintenance on a Monday morning so they could have staff on site at the Data Center so as to mitigate risk.

61.     When Plaintiff's personnel arrived at the Data Center on June 27, 2022, they could not locate anyone from GHD to assist with the Power Outage.

62.     Instead, when Plaintiff's personnel got to the Data Center, they were told to inquire with ColoHouse security desk representatives.

63.     It turned out that Anthony Patton, the Director of Operations for ColoHouse, was out on vacation on June 27, 2022.

64.     Brian McCarron, the person filling in for Mr. Patton, was paralyzed as a result of complaints by angry tenants.

65.     Plaintiff was informed that there was a ColoHouse representative on site but locked himself in his office and refused to come out.

66.     Because there was no means of remediating the Power Outage at the Data Center due to incompetent and/or absent personnel, Steve Francesco, Plaintiff's president and CEO, called ColoHouse's corporate offices and was given the phone number of Bill McNutt, the Senior Vice President of Operations at ColoHouse.

67.     Plaintiff, despite dozens of efforts to contact Mr. McNutt, still, to this date, has not received a return call from Mr. McNutt.

68.     With no other options, Mr. Francesco was forced to travel from Plaintiff's offices in New York City to the Data Center.

69.     When Mr. Francesco arrived at the Data Center, he finally was able to get in touch with Mr. McCarron (who was about to start lunch with his team).

70.     Mr. Francesco demanded that the PDU/breaker panel be checked.

71.     It was then discovered that a few breakers tripped and Defendants reset the

breakers, thereby restoring a majority of the systems after 1:00 PM (except for a few that stayed

down for a few days).

72.     Following the repair, Mr. McNutt sent the following mass email:

Dear Valued Client,

ColoHouse has verified completion of the scheduled electrical
maintenance on the Power Distribution Units (PDU) supporting the
data hall's B-Side power in RDC2 (Orangeburg, NY). All PDU's
that were taken out of service for the scheduled maintenance
during the controlled shutdown are back online as of 1:22pm EST.
Power distribution has been designed for the redundant PDU to
support customer critical load during the maintenance. The PDU's
supporting the A side load remained on UPS and Generator
backed. All dual power corded and appropriately load balanced
customer cabinet equipment should have remained online
throughout this procedure. No maintenance work was performed
on PDU's feeding A side circuits during this time.

Site: 1547 Critical Realty (1 Ramland Rd. Orangeburg, NY)
Data Hall: RDC2

If you experienced any service disruption during this maintenance,
please contact  support@colohouse.com and we will properly
assist you in setting up your production environments redundancy,
identifying single points of failure, analyzing load balancing
configurations and current A-B power draws to minimize risk and
exposure to your equipment.

73.     Mr. McNutt's email was a gross misrepresentation and mischaracterization of the

events of June 27.

74.     Of note, Mr. McNutt's email does not characterize the power maintenance

performed on June 27 as emergency work.

11

E.  **The Damage Caused By The Power Outage\**

75.     Because of the Power Outage, Plaintiff's customers lost access to their servers and cyber security systems for over five hours and Plaintiff's servers have been corrupted.

76.     Plaintiff has, thus far, paid a consultant $12,000 to repair Plaintiff's exchange servers that were corrupted by the Power Outage.

77.     Plaintiff has, thus far, paid a consultant $8,000 to review its servers' configurations following the Power Outage.

78.     Additionally, Mr. Francesco – who typically bills his time out at $450 to $600 per hour – has, since the Power Outage, provided over 100 hours of free consulting services to his clients in an effort to repair relationships, and was awake 54 straight hours following the Power Outage dealing with the fallout.

79.     Several of Plaintiff's customers have informed Plaintiff that they are evaluating immediately terminating their relationship with Plaintiff, representing tens of thousands of dollars of monthly revenue, because they no longer view Plaintiff's services as reliable.

80.     Most of Plaintiff's customer relationships are for one-year terms.  It is now unlikely they renew.

81.     Because Defendants' services can no longer be relied upon, Plaintiff has ordered over $80,000 worth of equipment so as to relocate resources from the Data Center to Parsippany, NJ and Edison, NJ data center locations, in an attempt to preserve customer relationships. Plaintiff will also incur an additional $150,000 of expenses building out additional infrastructure at the New Jersey data centers.

82.     In addition, Plaintiff will be forced to pay $12,000 to purchase four racks, $5,000 per month to maintain the four racks at the New Jersey data centers, and $6,000 to wire the four racks.

83.     Plaintiff estimates that its out of pocket costs relating to the Power Outage now exceed $200,000.

84.     Moreover, Plaintiff's reputation has been irreversibly damaged as a result of the Power Outage and Defendants' grossly negligent conduct.

**F.  Defendants Continue To Disregard The MSA**

85.     Making matters worse between Plaintiff and its customers, on July 22, 2022, a few weeks after the Power Outage, Plaintiff requested that Defendants perform certain simple support services on behalf of its customers.

86.     Besides opening a ticket, Defendants have ignored Plaintiff's request for support services, further jeopardizing Plaintiff's customer relationships.

**FIRST CAUSE OF ACTION**
**(Gross Negligence)**

87.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

88.     As a colocation services provider, Defendants owed Plaintiff a cognizable duty of care as it relates to scheduled power maintenance at the Data Center.

89.     Indeed, the Service Level Agreement expressly provides that Defendants "shall be responsible for repairing and maintaining the electrical system used to supply power to the [Data Center] and space…"

90.     With the exception of emergency maintenance, Defendants owed Plaintiff a cognizable duty of care to not schedule power maintenance during or immediately prior to business hours.

91.     Any colocation services provider (and, in fact, any technology support team) knows or should know that electrical and server maintenance should take place during off hours, such as the nights or weekends, especially when that colocation services provider is aware that many of the clients are in the financial services industry.

92.     Defendants breached their duty of care when they performed power maintenance, which triggered the Power Outage, at 8:00 A.M. on a Monday morning, which continued into the afternoon.

93.     By performing power maintenance on a Monday morning at 8:00 A.M, Defendants failed to exercise slight care or slight diligence to the rights of Plaintiff and, frankly, displayed a reckless disregard to the rights of Plaintiff.

94.     Defendants performed this power maintenance without proper notice to Plaintiff, while Defendants' director of operations was on vacation, and without even notifying its own employees.

95.     And, when they were notified of the problem, despite their contractual obligation to use their best efforts to remediate the problem, time being of the essence, Defendants instead hid, refused to take calls, and were more concerned about having lunch, than fixing the problem.

96.     In the 45 years that Plaintiff's CEO has been in the data center business, he has never seen power maintenance performed on a Monday morning.

97.     Service interruptions are a likely result of power maintenance; indeed, the MSA explicitly states that "[d]uring scheduled and emergency maintenance, [GHD's] services may be unavailable to [Plaintiff]."

98.     The fact that Defendants knew that service interruption was likely, yet chose to go forward with power maintenance on a Monday morning was, at a bare minimum, reckless.

99.     Thus, as a cause and proximate cause of Defendants' gross negligence and reckless disregard for the rights of Plaintiff, Plaintiff suffered damages in an amount to be determined at trial, including: (i) at least $80,000 spent on equipment to relocate resources to the New Jersey data centers; (ii) at least $150,000 spent migrating resources to the New Jersey data centers; (iii) at least $18,000 to acquire and wire four racks at the New Jersey data centers, plus $5,000 a month for the service; (iv) an additional $20,000 spent on consultants to remediate damage related to the Power Outage; (v) at least $50,000 of billable time spent by Plaintiff's CEO consulting with Plaintiff's clients to remediate damage related to the Power Outage; (vi) an amount to be determined by a finder of fact for potentially terminated contracts (if and when they are terminated); (vii) an amount to be determined by a finder of fact for contracts that are not renewed as a result of the Power Outage (if and when they are not renewed); (vii) reputational damages in an amount to be determined by a finder of fact but estimated to be at least $1,000,000; and (viii) together with interest, costs, expenses, punitive damages, and attorneys' fees.

### SECOND CAUSE OF ACTION
### (Breach of Contract – Monetary Damages)

100.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

101.    The MSA and all documents it incorporates (including the Addendum, Service Orders, and Service Level Agreements) is a valid and binding agreement.

102.    Plaintiff has fully performed its obligations under the MSA and all documents it incorporates (including the Addendum, Service Orders, and Service Level Agreements).

103.    The Service Level Agreement, incorporated into the Addendum and MSA, requires Defendants to "have the contracted power available for Plaintiff … 100% of the time when configured with redundant power" which is how Plaintiff's colocation space is configured.

104.    Defendants breached the Service Level Agreement (and thus Addendum and MSA) by failing to supply power 100% of the time.

105.    Further, the Service Level Agreement, incorporated into the Addendum and MSA, requires Defendants to "commence efforts to resolve any Service interruption within thirty (30) minutes after [GHD] learns of it" and to "use best efforts to remedy the Service interruption within one (1) hour of determining the source."

106.    Defendants breached the Service Level Agreement (and thus Addendum and MSA) by failing to commence efforts to resolve service interruption within 30 minutes after learning about it and by failing to use best efforts to remedy the service interruption within one hour after determining the source.

107.    Additionally, the Service Level Agreement, incorporated into the Addendum and MSA, makes Defendants "responsible for repairing and maintaining the electrical system used to supply power to the Data Center and Space and shall provide a generator to back up the power supply."

108.    Defendants breached the Service Level Agreement (and thus Addendum and MSA) by failing to provide a backup power supply on the day of the Power Outage.

109.    Plaintiff has been damaged by Defendants' breaches of contract as set forth above, including, but not limited to, potentially terminated contracts and non-renewed contracts.

110.    Further, pursuant to the Service Level Agreement, because the power was out for more than 60 minutes in June (and, in fact, over five hours), Plaintiff is entitled to a credit of the total monthly recurring charge for June 2022, which totals $21,901.16.

111.    Defendants have not provided Plaintiff with the credit it is owed and thus Plaintiff's damages are an additional $21,901.16, plus interest accruing at the maximum legal rate.

### THIRD CAUSE OF ACTION
### (Breach of Contract – Specific Performance / Permanent Injunction)

112.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

113.    The MSA and all documents it incorporates (including the Addendum, Service Orders, and Service Level Agreements) is a valid and binding agreement.

114.    Plaintiff has fully performed its obligations under the MSA and all documents it incorporates (including the Addendum, Service Orders, and Service Level Agreements).

115.    Section 13 of the MSA provides, in sum and substance, that neither party may assign or transfer its rights and obligations under the MSA without the other party's written consent.  It also provides that either party may transfer or assign the MSA and its rights and obligations thereunder to any of its affiliates, parent or subsidiaries or as part of a merger, sale of all or substantially all of its assets upon prior notice to the other party provided that the assignee agrees in writing to comply with all terms and conditions of the MSA.

116.    In breach of the MSA, GHD purported to assign the MSA to ColoHouse without obtaining the consent of Plaintiff, without notice to Plaintiff, and without ColoHouse agreeing in writing to comply with all terms and conditions of the MSA.

117.    Further, the MSA requires GHD to give five (5) business days written notice to Plaintiff in advance of scheduled maintenance when there is a change to GHD's standard scheduled maintenance window.

118.    In breach of the MSA, GHD failed to notify Plaintiff in advance of the power maintenance performed on Monday, June 27 at 8:00 A.M., which was certainly outside GHD's standard scheduled maintenance schedule.

119.    And, while ColoHouse did send the June 17 Email relating to the June 27 maintenance, Plaintiff did not see or review such an email because as of the time of the June 17 Email, Plaintiff had never heard of ColoHouse, nor its relationship to the Data Center because of Defendants' failure to notify Plaintiff of the acquisition and purported assignment of the MSA.

120.    Because Defendants failed to properly notify Plaintiff in advance of the power maintenance on Monday, June 27 at 8:00 A.M., Plaintiff did not have personnel on site who could have mitigated the damage and expedited the remediation of the Power Outage.

121.    Further, the MSA requires Defendants to provide support services on behalf of Plaintiff's customers.

122.    Since the Power Outage, ColoHouse has ignored Plaintiff's request for support services.

123.    There is no adequate remedy at law for Defendants' breaches of contract.

124.    Serious and irreparably injury will result absent a permanent injunction.

125.    The equities are balanced in favor of Plaintiff.

126.    Accordingly, Plaintiff is entitled to an award of specific performance, ordering Defendants to, in accordance with the MSA: (i) "provide at least five (5) business days prior written notice by email to Plaintiff at noc@coherecyber.com of scheduled maintenance affecting the Services" "[i]n the event of any change in [Defendants'] standard scheduled maintenance window"; (ii) obtain Plaintiff's consent prior to any future transfer or assignment of Defendants' rights and obligations under the MSA, unless the transfer or assignment is to an affiliate, parent, or subsidiary of Defendant, or as part of a merger, sale of all or substantially all of Defendants' assets, acquisition, or financing, in which case notice to Plaintiff that the assignee agreed in writing to comply with all terms and conditions of the MSA; and (iii) perform support services required by the MSA.

127.    Further, Plaintiff is entitled to an award permanently enjoining Defendants from performing scheduled maintenance outside their standard maintenance window without providing Plaintiff with at least five (5) business days prior written notice by email to Plaintiff at noc@coherecyber.com of scheduled maintenance affecting the Services.

**WHEREFORE**, Plaintiff demands judgment:

      (a)    On Claim I, damages in an amount to be determined at trial against Defendants, including damages for terminated contracts and/or non-renewed contracts, at least $230,000 for relocation and equipment expenses, at least $90,000 for out of pocket expenses relating to the Power Outage, at least $1,000,000 for reputational harm, plus punitive damages, attorneys' fees, and interest accrued at the maximum legal rate;

      (b)    On Claim II, damages in an amount to be determined at trial against Defendants, including damages for terminated contracts and/or non-

renewed contracts and $21,901.16 for recurring services charged in June by Defendants, plus interest accrued at the maximum legal rate and attorneys' fees;

(c)    On Claim III: (1) an award of specific performance, ordering Defendants to, in accordance with the MSA: (i) "provide at least five (5) business days prior written notice by email to [Plaintiff at noc@coherecyber.com] of scheduled maintenance affecting the Services" "[i]n the event of any change in [Defendants'] standard scheduled maintenance window" (ii) obtain Plaintiff's consent prior to any future transfer or assignment of Defendants' rights and obligations under the MSA, unless the transfer or assignment is to an affiliate, parent, or subsidiary of Defendant, or as part of a merger, sale of all or substantially all of Defendants' assets, acquisition, or financing, in which case notice to Plaintiff that the assignee agrees in writing to comply with all terms and conditions of the MSA; and (iii) provide support services required by the MSA; and (2) an award permanently enjoining Defendants from performing scheduled maintenance outside their standard maintenance window without providing Plaintiff with at least five (5) business days prior written notice by email to [Plaintiff at noc@coherecyber.com] of scheduled maintenance affecting the Services.

(d)    Awarding Plaintiff all disbursements, and costs incurred in bringing this action;

(e)     For such other and further relief as the Court may deem equitable, just and

proper.


Dated:     New York, New York
           August 10, 2022

                              HERRICK, FEINSTEIN LLP

                              By: */s/ Scott C. Ross*
                                  Scott C. Ross

                              2 Park Avenue
                              New York, New York 10016
                              Telephone:     (212) 592-1400
                              Facsimile:     (212) 592-1500
                              *Attorneys Cohere Communications, LLC*
                              *d/b/a Cohere Cyber Secure*